UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

COMMUNITY TIES OF AMERICA, INC.                                          PLAINTIFF

v.                                                              CIVIL ACTION NO. 3:12CV-429-S

NDT CARE SERVICES, LLC, et al.                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the court on motion of the plaintiff, Community Ties of America, Inc. ("CTA"), for reconsideration of the magistrate judge's October 30, 2013 Order granting the Kentucky Cabinet for Health and Family Services' ( the "Cabinet") motion to quash a subpoena issued to it by CTA. CTA has requested that the court take a closer look at the issues in the case and the materials sought under the subpoena. We have done so. For the reasons set forth herein, the court finds that the United States magistrate judge did not misapprehend the nature of the claims and defenses or the discovery sought and properly quashed the subpoena.

We start with the Complaint.

CTA describes its action as a "lawsuit about Defendants' wrongful misappropriation of Community Ties' clients, employees, contracts, certifications, and contractors; as well as tortious interference with its business and governmental relationships." Compl., ¶ 9.

CTA is a Support for Community Living ("SCL") services provider servicing developmentally and intellectually disabled individuals in a variety of states, and formerly in Kentucky. Compl., ¶¶ 10-12. Generally, individuals who receive SCL services require special care and attention in order to carry out activities of daily living. Compl., ¶ 12. From 2009 through mid-

2011, CTA provided both Staffed Residence and Behavior Support (non-residential) services in Kentucky. Compl., ¶¶ 13-15.

In this case, CTA seeks to establish that it was forced out of business in Kentucky by the defendants who conspired to wrongfully transfer the services of CTA's Behavior Support clients to Homeplace Support Services, LLC ("Homeplace"), a competitor of CTA. CTA also alleges that its former managers accepted employment with CTA's competitors and assisted them in hiring away CTA's personnel.

CTA had a contract with the Cabinet to provide SCL services to Medicaid recipients in Kentucky. Compl., ¶ 10. During the period of time in 2011 pertinent to this case, CTA had eight clients in Staffed Residences. CTA provided Behavior Support services to 190 additional clients in nonresidential settings. On June 12, 2011, an employee of CTA beat residential client Shawn Akridge to death in a CTA Staffed Residence in Paint Lick, Kentucky.[1] On June 15, 2011, CTA made the decision to cease providing Staffed Residence services in Kentucky, and informed the Cabinet so that residents of its staffed facilities could be transitioned to other providers of Staffed Residence services. Compl., ¶ 32.

The murder of Shawn Akridge received national media attention. Tyler Brock was indicted on July 23, 2011 for the murder. The Cabinet sent two notices of the termination of CTA's Kentucky Medicaid Program Provider Agreement, one dated July 26, 2011 and the other dated July 29, 2011. Both notices stated that CTA's certification as an SCL provider would terminate and CTA would not be entitled to receive any reimbursement for SCL services provided after July 29, 2011

---

[1] The complaint references a resident's death on June 13, 2011, and references "the June 13 incident," however, every other document, including CTA's settlement conference statement, indicates that the incident occurred on June 12, 2011. The employee, Tyler Brock, was indicted for murder in July, 2011.

(1st notice, DN 56-5), and extended to August 2, 2011 (2nd notice, DN 56-6). The notices stated that "[t]ermination of the SCL provider certification and Provider Agreement of [CTA] is necessary to protect the health, safety, and well being of residents who have been placed under its care. Justification is based on the July 23, 2011 indictment of an employee of [CTA]." DNs 56-5; 56-6. CTA appealed the notice of termination and ultimately settled the matter with the Cabinet on July 12, 2012. The settlement provided that the Cabinet would withdraw its notice of termination for cause and issue a termination for convenience which would be without prejudice to CTA. In exchange, CTA agreed to dismiss its appeal. DN 57-9. Despite the fact that the settlement agreement noted that CTA was not precluded from re-applying with Medicaid and serving as a provider of SCL or other services, CTA is no longer an SCL services provider in Kentucky.

The parties dispute the significance of various events which allegedly occurred between May and August, 2011. CTA contends that its employees, Steve and Barbara Foreman, acted in concert with Carla Barrowman Clevenger, owner of Barrowman Case Management and member of Homeplace Support Services, LLC, to capitalize on the notices of termination received by CTA and divert clients, CTA employees, and independent contractors associated with CTA to Homeplace. CTA alleges that the defendants engaged in a course of conduct to mislead clients and CTA personnel into believing that the CTA would cease all operations in Kentucky as a result of the notices of termination. Clevenger allegedly hired away the Foremans from CTA and purportedly began to solicit CTA clients and personnel as soon as the first notice was issued. CTA contends that it was in good standing with respect to its Behavior Support (non-residential) services, and that it never intended to abandon nor did the Cabinet have a basis to terminate its certification with respect to that aspect of its business.

The defendants claim, essentially, that they did nothing untoward in participating in the transitioning of both SCL and Behavior Support clients to Homeplace and Barrowman, as CTA's loss of Medicaid reimbursements and moratorium on taking on new clients rendered the company's future ability to operate in Kentucky unlikely.

CTA seeks death investigation records concerning two deaths which occurred during the same time period as the murder at the CTA Staffed Residence. It contends that the information is reasonably calculated to lead to the discovery of admissible evidence.

First, CTA urges that it requires the death investigation records to refute the purported assertion of the defendants' expert that, "due to the death of a CTA resident, it was 'inevitable' that Plaintiff would be automatically barred from doing business in Kentucky." (*citing* Cecil depo., pp. 81-82). CTA contends that the death investigation records will be useful to refute Cecil's assertion, because two clients in the care of Homeplace died, yet Homeplace continues to operate in Kentucky today. Therefore, CTA urges, there is nothing automatic about the process.

First, it appears that CTA already has the pertinent information on this point – the fact that Homeplace continues to operate despite two deaths on its watch. The specifics concerning the death investigations will not add any relevant information.

Second, the premise that CTA purports to refute was not quite as CTA represents it. Cecil did not testify that a death at CTA would "automatically bar[] [CTA] from doing business in Kentucky." DN 78, p. 3. Rather, her comment about inevitability came after extensive discussion of a variety of issues related to the operation of the CTA facility. When questioned concerning the basis for her conclusion, the following exchange occurred:

> Q: And the letter [of termination] didn't mention any of the other things you said you relied upon when you said you gave the opinion that the basis for the termination

[sic] I think you gave a list of six different things and I wrote them down. The only one listed in the termination letter is the indictment of the employee?

A: That's correct.

Q: So all these other points you're speculating that that may or may not have been a reason the Cabinet sent the termination letter. Correct?

A: I don't think it's speculation when you have investigative reports that point out specific issues, but those may or may not have risen to the level of termination. In this case an individual under the care of CTA was murdered and was indicted for murder. And at that point the commissioner in my opinion made the right decision to ask for termination.

Q: What do you mean by right? Morally right? Legally right?

A: I believe it was inevitable. He had no choices. He had no choice.

Cecil depo., pp. 81-82. After noting that there were investigative reports concerning a variety of issues that may or may not have been sufficient to mandate termination, Cecil stated that the murder of the client by the CTA employee was clear justification for termination, and it was therefore inevitable on the heels of other issues. The court does not see that the death investigation reports sought by CTA would advance any theory to refute Cecil's testimony.

CTA contends that the death investigation records are pertinent to the defendants' "credibility." To that end, it urges essentially the same point raised with regard to Cecil's testimony. CTA urges that it must refute certain representations of Clevenger and Stephen Foreman that termination was an inevitable result after the death of a client.

Foreman testified that "the clients that were under Community Ties had to be transitioned" to an alternative provider after termination by the Cabinet. (Foreman depo., p. 163). Contrary to the assertion of CTA, however, Foreman did not state, as CTA asserts, that this was "an inevitable

result of the death of a CTA client." DN 78, p. 4. Similarly, CTA cites to deposition testimony of Clevenger in which the following exchange occurred:

> A: Just how it was a sad thing. People were going to be without jobs. Clients were going to, you know, potentially lose services for a period of time.
>
> Q: Did Mr. Foreman tell you that Mr. Lee had said of Mr. Lloyd had said that?
>
> A: No.
>
> Q: Do you know what led him to believe that services were going to be terminated?
>
> A: Again, Medicaid closed them down. I have witnessed numerous closures. Steve I'm sure has as well. That's what happens. They, someone from the Cabinet will come in and transfer the clients.

Clevenger depo., p. 148. This testimony does not refer to the basis for termination. It does not suggest that a client death will inevitably result in the termination of a provider's contract. Rather, it references termination of client services and transitioning of clients in the event that "Medicaid closed them down." Clearly, death investigation records concerning other unrelated deaths would not generate relevant evidence to refute Foreman's or Clevenger's testimony concerning the post-termination process of transitioning and servicing clients.

CTA cites to an affidavit of Cabinet employee Pam Taylor who will purportedly testify, contrary to Clevenger's and Foreman's testimony, that she did not order Foreman to transfer CTA's Behavior Support clients to another provider, but that it was Foreman who told her that CTA had decided that it would no longer provide those services. Taylor will represent that CTA could have continued to provide Behavior Support services. DN 78, pp. 4-5. The court finds that the death investigation records sought by CTA do not appear to be relevant to questions concerning communications with the Cabinet, or CTA's options under the circumstances.

The court has not been shown a connection between information to be gleaned from the death investigation records and the credibility of the defendants.

Finally, CTA contends that the death investigation records are relevant to shed light on Homeplace's relationship with the Cabinet and the quality of care provided by Homeplace, two inquiries which do not appear to have any relevance to the issues in the case. CTA cites to Cecil's expert report for the defendants in which she stated that:

> After termination from the program, the focus for all Cabinet officials and employees [was] to work with the terminated provider and employees to ensure a safe transition and relocation of all recipients who had been served by the terminated entity.

Cecil Rpt., p. 5. However, the success or failure of its endeavor to "ensure a safe transition and relocation of all recipients" is not in issue in this case. Thus the death investigation records are irrelevant in this context.

For the reasons set forth herein and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motion of the plaintiff, Community Ties of America, Inc., for reconsideration of the United States Magistrate Judge's Order granting the motion of the Kentucky Cabinet for Health and Family Services to quash a subpoena for the production of death investigation records (DN 78) is **DENIED.**

March 6, 2014

                                                   Charles R. Simpson III, Senior Judge
                                                      United States District Court