UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

COMMUNITY TIES OF AMERICA, INC                                    PLAINTIFF

v.                                                               NO. 3:12-CV-00429-CRS

NDT CARE SERVICES, LLC                                           DEFENDANTS
d/b/a Homeplace Support Services, LLC, et al.

## MEMORANDUM OPINION

This matter is before the court on motion of the Plaintiff, Community Ties of America,

Inc., for partial summary judgment as to Counts I, II, III, IV, VI, VII, XI, and XII in the

Complaint, on motion of the Defendants, Stephen M. Foreman and Barbara J. Foreman (the

"Foremans"), for summary judgment as to all Counts in the Complaint, and on motion of the

Defendants, NDT Care Services d/b/a Homeplace Support Services, LLC, The Carla Barrowman

Corporation d/b/a Barrowman Case Management, and Carla Barrowman Clevenger (the

"Clevenger Defendants"), for summary judgment as to all Counts in the Complaint. DN 1.  Fully

briefed, the matter is now ripe for adjudication.  Having considered the parties' respective

positions, the Court concludes that there are no material issues of fact in dispute as to all Counts

against the Defendants.  For the reasons set forth below, the Court will grant the Defendants'

motion for summary judgment and deny the Plaintiff's. DN 87-1; DN 89-1.

## I.

Community Ties of America, Inc. ("CTA") is a corporation based in Nashville,

Tennessee that, as of the time the actions described herein began, provided "Behavior Support"

and "Residential Services" to individuals with severe developmental disabilities across several

states.  In 2009, CTA's Chief Executive Officer ("CEO") Ron Lee ("Lee") decided to expand

CTA's business into Kentucky. Lee enlisted Tim Lloyd ("Lloyd"), Executive Director of CTA, and Stephen Foreman, a Behavior Analyst, to lead this expansion. He appointed Stephen Foreman to supervise the Kentucky operations and gave him the title of Program Manager. Barbara Foreman, Stephen's wife and fellow Behavior Analyst, also relocated to Kentucky to continue working for CTA. Through their positions, Stephen and Barbara Foreman (the "Foremans") had access to CTA's client files, employee files, and client lists, which were kept under "double lock and key" in their home office. The Foremans are now employed by Homeplace Support Services, LLC ("Homeplace"), which comprises one part of the, and is closely related to the remaining, Clevenger Defendants. CTA's claims against the Foremans and the Clevenger Defendants arise from the following facts that, except as noted, are undisputed.

From its entry into the Commonwealth and up to the events in question, CTA's Kentucky revenue was almost wholly comprised of reimbursements it received from the Commonwealth under its enrollment in what is known as the Supports for Community Living ("SCL") program.[1] Kentucky's SCL program provides Medicaid reimbursements to organizations like CTA that maintain a Medicaid Provider Number, Medicaid Certification, and a Medicaid Contract with the Commonwealth, all of which enable them to provide services to Medicaid-eligible individuals. The Kentucky Cabinet for Health and Family Services (the "Cabinet") administers the SCL program and furnishes Medicaid Provider Numbers to organizations like CTA. CTA obtained a Provider Number in 2009 and used it to supply reimbursable services on two fronts: through its Residential Supports program, where it provided services to clients living in supervised group homes, and through its Behavior Supports program, where it provided services to privately-housed clients. CTA had several group homes in Kentucky, although the Behavior Supports program comprised the majority of its business in the Commonwealth.

---

[1] *See* DN 90-1.

On June 12, 2011, CTA employee Trevor Brock murdered a CTA client, Shawn Akridge, in a CTA Residential Supports group home in Paint Lick, Kentucky.  News coverage ensued, and the Cabinet responded by placing CTA on its second moratorium – an act that prevents a provider from taking on any new clients – in a period of six months.  In response to the moratorium, CTA wrote the Cabinet on June 15, 2011 to indicate that it would be voluntarily ceasing the Residential Supports portion of its Kentucky operations but desired to continue its Behavior Supports program. DN 89-20. During this time, at least one CTA Behavior Analyst expressed concern about CTA's future and its employees' job security.  DN 82-14.  The Foremans allege that Lee did not reach out to CTA's Kentucky employees during this time, even though Lloyd had warned Lee that CTA's staff was disgruntled.

Around July 13, 2011, while the investigation of Akridge's death continued to unfold, Carla Barrowman Clevenger ("Clevenger"), owner of Homeplace and Barrowman Case Management ("BCM"), approached Stephen Foreman to discuss the possibility of him transferring to Homeplace, which had a valid Medicaid Provider Number at the time, and creating a Behavior Supports Division there.  Clevenger was aware of the murder and assumed it would result in the Cabinet "terminating" CTA's Medical Provider Contract and Number – an assumption that would eventually prove correct. DN 82-2.  She then set up a dinner with the Foremans, and they agreed to attend as part of the their larger plan to "interview[] other companies to see who would be viable and who would be the best fit for [CTA's] clients." DN 82-17, p. 108.  It is undisputed that Clevenger offered the Foremans employment at Homeplace during that dinner, DN 82-1, p. 84-85, and that they discussed what a transition of CTA's clients and Behavior Analysts to Homeplace "would look like." DN 82-1, p. 24-25.  Then, as early as

June 18, the Foremans began "brainstorming some place to hold meetings" with CTA's Behavior Analysts. DN 89-23.

Then on June 25, 2011, Clevenger confirmed her assumption that the Cabinet would terminate CTA's Medical Provider Contract and Number. She spoke to a Cabinet employee who indicated that the Cabinet was preparing to terminate a SCL provider's Medicaid Contract – a provider Clevenger deduced was CTA. DN 82-2, p. 126-27. Clevenger called Stephen Foreman to inform him of the impending termination, and, that same day, decided to offer employment to all of CTA's Behavior Analysts. *Id*. at 147. She and Stephen's conversation rested on the continued assumption that CTA's termination would prevent CTA from serving Medicaid clients and, thus, removing its need and ability to employ Behavior Analysts. *Id*. at 149-53.

Next, the Cabinet issued the anticipated Notice of Termination letter to CTA on July 26, 2011. DN 89-24. The letter advised CTA that "as of July 29, 2011, [its] certification as an SCL provider will hereby be terminated . . . [and it] shall not be entitled to receive any reimbursement for []SCL[] services provided after July 29." *Id*. It explained that the "[t]ermination . . . [wa]s necessary to protect the health, safety, and well[-]being of residents who have been placed under its care" and based on the indictment of Tyler Brock. *Id*. The Cabinet cited two critical provisions in the letter: Sections 1(39) and 6(19) of 907 Ky. Admin. Regs. 1:671. Section 1(39) defines the operative term "terminated" as meaning "a provider's participation in the Medicaid Program has been ended, and that a contractual relationship no longer exists between a provider and the department for the provision of Medicaid covered services." 907 Ky. Admin. Regs. 1:671 § 1(39). Relevant here, Section 6(19) explains that the Cabinet "may terminate a provider immediately, if necessary to protect healthy, safety, or well-being of Medicaid recipients" – not coincidentally, the same language the Cabinet invoked as its basis for the termination. 907 Ky.

4

Admin. Regs. 1:671 § 6(19); DN 89-24.   The letter explained, critically, that the Cabinet would be "seeking immediate alternative placement" for CTA's clients and warned that "[a]ny efforts by [CTA], its staff, or anyone working in concert with it to disrupt or impede the orderly relocation of the[se] individuals . . . shall be subject to any and all remedies provided by law." *Id*. Nothing in it, however, prevented CTA from continuing to provide non-SCL services to private-paying clients.

The Notice went on to explain that CTA had the right to apply for reinstatement as a SCL provider, and that it could appeal the termination in "an administrative hearing pursuant to 907 KAR 1:671, Section 9." DN 89-24.   So on August 1, 2011, after hiring counsel, CTA filed an appeal of the Notice of Termination. DN 89-25.   In a CTA conference call to which Stephen Foreman and Lloyd were parties, Lee explained that CTA was appealing the termination and that it planned to continue paying its employees and serving clients during the appeal. DN 82-5; DN 82-1.   Stephen Foreman and Lloyd then participated in strategy calls with CTA management and Lee, during which CTA's future was discussed. *Id*.   During these calls, Stephen Foreman never mentioned Homeplace, his plans to leave CTA, or any plans to transition CTA's Behavior Analysts and clients to Homeplace. *Id*.   Nor did he reveal the actions that he was taking action to see these plans through.

So what actions was Stephen Foreman taking?   In an e-mail dated July 26, 2011, Stephen told Clevenger that he had copied CTA's "employee files," DN 89-27, though he never requested CTA's permission to do so.   Then on July 27, 2011, the Foremans invited CTA's Behavior Analysts to an "urgent" meeting through their CTA e-mail accounts. DN 89-16.   At the meeting, the Foremans informed the Behavior Analysts in attendance about the Notice of Termination letter, of their plans to begin working for Homeplace, and that Homeplace was willing to employ

any CTA Behavior Analyst that desired to transfer with them. DN 82-1.  The Foremans communicated the same by telephone to the Behavior Analysts who could not attend. *Id*.  They did not explain to the Behavior Analysts, however, that CTA planned to appeal the termination, continue paying its Behavior Analysts, and continue serving its clients. DN 82-12.  Whether the Foremans communicated that CTA was "closing" during these conversations is disputed, DN 89-1, p. 21-22; DN 82-1, p. 84-85, 159; moreover, whether the Behavior Analysts understood Stephen Foreman's representations, regardless of whether he used the term "closing," to mean that CTA was shutting down its Kentucky operations or merely losing its Medicaid Provider Contract is also disputed.  It is undisputed, however, that the Foremans never informed Lee that they would be holding this meeting.

Then, on July 29, the Cabinet issued another Notice of Termination ("Termination II") that extended CTA's termination deadline to August 2, 2011.  This letter postponed CTA's termination deadline back to August 2 to "allow for a safe transition of the five waiver recipients still residing in [CTA] homes" as of July 29. DN 56-6.  When CTA received the letter, Stephen Foreman had a telephone conversation with Cabinet employee Pam Taylor – a conversation that he claims confirmed his understanding that the Notice of Termination letters *required* that CTA's Behavior Analysts and clients be transferred to a provider other than CTA. DN 87-1.  Pam Taylor's testimony, however, is that she never gave such an instruction to Stephen Foreman, and that Foreman "[b]asically" represented that "CTA had decided to no longer provide services to its behavioral support clients" in response to the termination. DN 82-16, p. 13-14.  Taylor's testimony also reveals that, in response to her mentioning that CTA's clients had "freedom of choice" with regards to service providers, Stephen Foreman represented that CTA's clients would be transferring to Homeplace. *Id*. at 12.  And in a follow-up e-mail to Taylor later

6

that day, Stephen Foreman wrote that he was "in the process of transitioning all of [CTA's] behavior support specialists to Homeplace Support Services" and that he was "contacting all case managers to let them know of CTA's *closing* and [with which] agency that the providers will be continuing their service." DN 89-38 (emphasis added).  Taylor has since indicated that she is unsure whether Stephen Foreman represented that CTA was voluntarily closing during their telephone conversation, or that, instead, "it was [just] understood that CTA was closing." DN 87-4, p. 2.

CTA alleges that, next, its Behavior Analysts began contacting CTA's clients and client case managers, notifying them that CTA was closing, and explaining that they could follow the Behavior Analysts to Homeplace to avoid a lapse in coverage. DN 89-1.  It further alleges that the Behavior Analysts presented them with no provider options other than Homeplace.  CTA claims that the clients and case managers were then given pre-formatted Homeplace documents to effect such a transaction. *Id.*

One Behavior Analyst testified that, in meeting with his clients, he told them "that really nothing changed other than the agency that [he] work[s] with;" he now explains that the transition was "pretty immaterial to [the clients]." DN 82-13, p. 22.  It is undisputed that every CTA client moved over to Homeplace in a matter of days, DN 82-14, and that the clients signed information release forms at some point during or after the transfer.  Along those lines, the parties dispute whether the clients signed any such release or "consent form" before their information was transferred to Homeplace.

On July 31, Stephen Foreman sent an e-mail to the CTA clients' case managers explaining that CTA would "no longer be providing behavior services under the Medicaid waiver." DN 89-31.  The e-mail went on to say:

7

> [CTA's] current clinicians will be transferring to Homeplace . . . and will have the ability to continue serving all of their current clients.  I deeply apologize for this inconvenience and ask for your assistance in transferring those clients/families who wish to continue receiving the services of their current clinician over to Homeplace by modifying their Map 109's and dating their PA's for August 2nd to ensure there is no lapse in services . . . .
>
> [The Cabinet] has contacted us with their support of the transitions of and have expressed their willingness to help out in any way during this process.

*Id*.  That same day, Lee sent Stephen Foreman an e-mail asking why he wouldn't return his calls. DN 89-26.

Then, early the morning of August 1, 2011, Stephen Foreman sent Tim Lloyd a 30-day notice of his intent to resign from his position at CTA. DN 89-33.  Around 9:00 AM that same morning, Stephen used his CTA e-mail account to send Homeplace job applications to CTA's Behavior Analysts.  His e-mail indicated that he would follow up with more documentation and asked the Behavior Analysts to "follo[w] up with [case managers] and [clients'] guardians" to "help speed up the transfer process." DN 89-37.  He then used his CTA e-mail account to inform Clevenger that he had "copied all client files." DN 89-28.  And late that evening, around the same time Stephen Foreman was attending a Homeplace Board of Directors meeting, DN 89-32, Lee's suspicions about Stephen's activity prompted him to examine Stephen's CTA e-mails for misconduct.

This quickly revealed Stephen's behind-the-scenes activity and evidence indicating that Stephen had deleted several emails. DN 82-6.  In response, CTA "unplugged the [Foremans'] internet connection . . . from [its] network." *Id*.  By this point, however, the Foremans had copied all of the CTA-related files from their CTA-issued laptops and saved them onto personal hard drives. DN 82-1.  Stephen turned to a personal e-mail account and continued to contact CTA employees and ask if they could contact clients' guardians and case managers "to speed up the

8

process." DN 89-35.  Not a single CTA client faced a disruption in services because of the transfer to Homeplace.

On August 2, 2011, the effective date of the Notice of Termination, Lee e-mailed CTA's staff and communicated the following:

1). they, the staff,  had been incorrectly informed that CTA no longer intended to provide behavioral support services under the Medicaid Waiver in Kentucky;

2). CTA had always intended to pursue remediation of the termination and wished to retain all staff and contractors during the appeal with pay;

3). because a review of Stephen Foreman's e-mail indicated "that all staff and contractors have been encouraged and have transitioned to a new provider," he stated that he was unable to "know which clients, employees, or contractors remain" with CTA and, thus, terminated all of their contractual relationships as of July 31, 2011; and,

4). CTA's plans to seek an injunction against the Cabinet and enjoin the termination had been cancelled due to all of the transfers to Homeplace. DN 89-30.

After this e-mail, CTA went forward with its appeal of the Notice of Termination.  It resolved the appeal by a Notice of Settlement and Dismissal on July 12, 2012, almost an entire year after the termination's August 2, 2011 effective date. DN 25-1.    The terms of the settlement were that CTA agreed to dismiss its appeal and terminate its Medicaid Provider Contract *for convenience* and *without prejudice* in exchange for the Cabinet's withdrawal of the July 26, 2011 Notice of Termination *for cause*. *Id*.  The Settlement permits CTA to reapply for a Medicaid Provider Number in Kentucky. *Id*.  CTA maintains that, but for the Foreman's actions, it would have continued to pay staff and serve clients during the appeal period. DN 82-15.

Based on the foregoing, CTA filed this action against the Foremans and the Clevenger Defendants bringing fourteen claims centered around their alleged wrongful misappropriation of CTA's clients, employees, contracts, certifications, and contractors and tortious interference with CTA's business and governmental relationships.

## II.

A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp*., 303 F.2d 425 (6th Cir. 1962).  However, the nonmoving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324.  It must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will

be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

## III.

Plaintiff contends that it is entitled to summary judgment on Counts I, II, III, IV, VI, VII, XI and XII in the Complaint. The Defendants separately contend that they are entitled to summary judgment on each count in the Complaint.  The parties have dedicated a large part of their briefing to addressing CTA's proof of causation in the aggregate and separate from their claim-specific arguments.  To accommodate this approach, the Court will also discuss the parties' causation arguments separately, in Part K below.  Accordingly, our count-specific analysis in Parts A-J will intentionally exclude any discussion of damage causation, *infra* Part A-J, and we will address it on the back-end.

### A.  Count I: Breach of Fiduciary Duties

All parties have moved for summary judgment as to Count I of the Complaint, in which CTA alleges that the Foremans breached their fiduciary duties by planning, arranging and completing the transfer of CTA's Behavior Support business to Homeplace.  A breach-of-fiduciary-duty claim has three elements: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom."[2] *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F.Supp.2d 902, 916 (W.D. Ky. 2007) (citing *Strock v. Pressnell*, 38 Ohio St. 3d 207, 527 N.E.2d 1235, 1244 (Ohio 1988)).

### 1.  Existence of a Fiduciary Relationship

Kentucky recognizes fiduciary relationships in several forms, ranging from attorney-client, to partner-to-partner, and even employer-employee. *Henkin, Inc. v. Berea Bank & Trust*

---

[2] *See infra* Part K.

*Co.*, 566 S.W.2d 420, 423 (Ky. Ct. App. 1978).   And while it is presumed that an officer or director of a corporation is a fiduciary that owes duties of loyalty and faithfulness, a "'mere' salesperson" may owe a fiduciary duty to his or her employer if the "specific circumstances of his or her employment" so require. *Miles Farm Supply, LLC v. Helena Chem. Co.*, 4:06-CV-23-R, 2008 WL 3010064, at *7 (W.D. Ky. Aug. 1, 2008) (citing *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 715-16) (6th Cir. 2005)) *aff'd*, 595 F.3d 663 (6th Cir. 2010).   These circumstances exist where there is a relationship "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *ATC Distribution Grp.*, 402 F.3d at 715 (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Courts derive these relationships from agency principles and their understanding that "[o]ne cannot faithfully or fairly serve two masters" – one's employer and oneself. *Stewart*, 557 S.W.2d at 436, 438 (quoting *Hoge v. Kentucky River Coal Corp.*, 287 S.W. 226 (1926)); *Aero Drapery of Kentucky, Inc. v. Engdahl*, 507 S.W.2d 166, 168 (Ky. 1974).

Kentucky courts are willing to find a fiduciary relationship between an employer and employee when the employee has a "position of trust, the freedom of decision[,] and access to confidential corporate information." *Aero*, 507 S.W.2d at 168-69; *Stewart v. Ky. Paving Co.*, 557 S.W.2d 435, 438 (Ky. App. 1977).   For example, a Kentucky court found that a salesman owed fiduciary duties to his employer simply because he solicited contracts on behalf of the company and had access to its confidential information – circumstances, the court found, that put him in a position of trust.   *Stewart*, 557 S.W.2d at 436, 438.   This Court has cited this line of cases with approval and found similarly. *Serv. Drywall Co. v. Commonwealth Walls, Inc.*, 3:06-CV-372-S,

2008 WL 1897728, at *2 (W.D. Ky. Apr. 28, 2008).   In *Service Drywall*, we found that a "branch manager" owed fiduciary duties to his employer because he had oversight and control over operations of one office and access to the company's confidential information; he referred to himself as a manager; and, he was charged with "selling the company," budgeting and billing jobs, and approving time sheets and payroll. *Serv. Drywall*, 2008 WL 1897728, at *2.   These decisions focus our inquiry here.

The conditions of Stephen Foreman's employment with CTA leaves no doubt that he was a fiduciary.   First, that he held a position of trust is evident from the following: 1). Lee sent him to Louisville to "begin a branch of Community Ties," DN 82-16, p. 19; 2). Stephen was named Program Manager in Kentucky, a position that required to him to manage CTA's entire Behavior Supports program in the Commonwealth, ensure its compliance with state and company standards, and consult with CTA's funding sources, DN 82-1; 3). CTA required him to sign a confidentiality agreement that contemplated his exposure to, and non-disclosure of, protected health, proprietary, and confidential information,[3] DN 89-11, and; 4). Lee included him in executive-level conference and strategy calls about CTA's future. DN 82-1.   Second, and bolstering our finding that he held a position of trust, Stephen not only had access to all of CTA's Kentucky client files, employee files, and business records, but kept them at his and Barbara Foreman's residence. DN 82-16.   Lastly, Stephen had at least some "freedom of decision" because his duties as Program Manager also required that he decide which clinicians to hire, review behavior support plans and assessments, and make efforts to increase CTA's business. DN 82-1.   Consequently, given the trust CTA held in him, the discretion CTA allocated

---

[3] The validity of this agreement is discussed below, *infra* Part J.   Although this agreement is not dispositive of Community Ties' breach-of-fiduciary-duty claims, *see Invesco Institutional (N.A.), Inc. v. Johnson*, 500 F. Supp. 2d 701, 708 (W.D. Ky. 2007) (analyzing contractual and common-law fiduciary duties separately), it imparts Community Ties' belief that the Foremans' fidelity was important and weighs in favor of our that they owed fiduciary duties.

to him, and his substantial access to confidential information, we find that Stephen Foreman was a fiduciary of CTA.

Nevertheless, we are not convinced that Barbara Foreman was a fiduciary of CTA.  It is undisputed that she reviewed and had significant access to CTA's confidential records, but the theme running through our fiduciary-duty jurisprudence is that such access will not, alone, put an employee in a position of trust. *Stewart*, 557 S.W.2d 435, 438 (Ky. Ct. App. 1977) (finding that a salesman owed fiducial duties to his employer where he had access to confidential information *and* played a role in managing the company); *Miles*, 2008 WL 3010064, at *12 (finding that a member of upper-management did not owe fiduciary duties despite referring to himself as a manager and having access to confidential information).   CTA has not pointed to that "something more."  Harmful here, CTA has not shown that Barbara had any sort of "oversight and control over the operations [CTA's] Louisville office." *Serv. Drywall*, 2008 WL 1897728, at *2.  She did not sell the company, budget or bill, was not a manager, and had never even met CTA's CEO, Lee.

In other words, although Barbara was trusted with access to confidential information – access that a secretary might have – we are unconvinced that CTA placed her in a "position of trust" for fiduciary purposes.  She worked at CTA as a mere Behavior Analyst and only began providing clinical supervision services sometime during or prior to 2011. DN 82-16, p. 26-27.  Although CTA places significant weight on the fact that Barbara provided these clinical supervision services, she did so simply because the Behavior Analysts needed someone to document their hours as part of their board-certification process; it was to meet regulatory requirements and was not an internal promotion.  This role did not give her "any rank over employees" or increase her salary.  In fact, any Behavior Analyst that has been board-certified

14

for over two years can provide clinical supervision services. DN 82-17, p. 29.  So considering Barbara's relative position, authority, and access at CTA, we find that CTA has failed to present a genuine issue of fact as to whether she owed it fiduciary duties. *Id*. at 28.

Given our finding that Barbara Foreman has not been shown to be a fiduciary, the Court will consider only whether Stephen Foreman breached his fiduciary duties.

### 2.  Stephen Foreman's Breach of Fiduciary Duties

Drawing on the notion that "private interest must yield to the official duty whenever those interests are conflicting," *Aero*, 507 S.W.2d at 169 (quoting *Reinhardt v. Owensboro Planning Mill Company*, 215 S.W. 523 (Ky. 1919)), courts have noted several duties that an employee-fiduciary must obey: 1). he must fully disclose, without ambiguity or reservation, any conflict between his private interest and his employer's, *DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985) (citations omitted); *Aero*, 507 S.W.2d at 169 (citing *Wendt v. Fischer*, 154 N.E. 303, 304 (1926)); 2). he must fully disclose to his employer any information, gained from whatever source, that, if withheld, could damage the corporation, *DSG*, 754 F.2d at 682; 3). he may not, while still a fiduciary, set up a competitive enterprise, *DSG Corp*, 754 F.2d at 682; *Aero*, 507 S.W.2d at 169 (citing *Witmer v. Arkansas Dailies, Inc*., 202 Ark. 470, 151 S.W.2d 971 (Ark. 1941)); 4). he may not resign and take key personnel of his employer for the purpose of operating his own competitive enterprise, *id*. (citing *Duane-Jones Company, Inc., v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (Ny. 1954); and, 5). he may not, after the fiduciary relationship has terminated, use fiducial confidences to profit at the expense of his former employer. *Id*. at 170. An employee *may*, however, "clandestinely" meet with other employees to discuss the mere possibility of forming a competing enterprise.  *See ATC*, 402 F.3d at 716.  But the record as developed reveals that Stephen Foreman went several steps beyond discussing the mere

possibility of forming a competing enterprise and violated several, if not all, of these duties in the process.

First, CTA's evidence reflects that Stephen Foreman failed to fully disclose the swelling conflict between his and CTA's interests in violation of his first duty.  By his own admission, Stephen Foreman called an "urgent" staff meeting with CTA's Behavior Analysts, during which he invited the CTA employees to transfer with him to Homeplace.  Yet, he never informed Lee that this meeting was going to take place, that he was leaving to work for a competitor, or that he planned on asking CTA's Behavior Analysts to join him.  Stephen then provided the Behavior Analysts with Homeplace job applications and solicited CTA's clients and case managers in the same manner.  Even then, he neglected to inform Lee of his plans and actions, both of which were in direct conflict with Lee's plans to continue employing and serving the same individuals. Next, after Stephen learned that all of CTA's Behavior Analysts would, in fact, be transferring the Homeplace, he used his CTA email account to provide CTA's staff with paperwork that was necessary to facilitate their transfer to Homeplace.  One such email notified clients' case managers that CTA would "no longer be providing behavioral services under the Medicaid waiver" and requested "assistance in transferring those clients/families who wish to continue receiving the services of their current clinician over to Homeplace." DN 89-31.  Stephen also emailed Clevenger through his CTA email account to notify her that he had "copied all client files." DN 89-28.  So after taking such substantial efforts to move CTA's Behavior Support division to Homeplace, Stephens conflict with CTA was *so glaring* that full disclosure should have followed.  Remarkably, he disclosed nothing.

16

Stephen argues that he did meet his duty of full disclosure because he kept CTA Executive Director Tim Lloyd, his direct supervisor, abreast of his actions.[4] But the record tells a different story. Lloyd testified that he did not learn about Stephen's "urgent" meeting or "that Steve had moved his staff and himself over to another agency [a]nd that clients were following him" until *after* the transition had occurred. DN 87-19, p. 113-15. In fact, Lloyd learned this from Lee, not Stephen; coincidentally, Lee only discovered this information through his investigation of Stephen's email. *Id.* Thus, we cannot say that Stephen fully disclosed his conflict "without ambiguity or reservation," and Stephen points to nothing in the record to rebut this. Moreover, CTA points to two critical facts that thwart any argument that Stephen engaged in full disclosure: he participated in conference and strategy calls that discussed CTA's post-notice plans and future and *never mentioned* his conflict, DN 82-1, and he deleted emails from his CTA email account prior to the end of his employment. DN 82-7. Where this is undisputed, no rational juror could find that he fully disclosed his conflict.

Turning to his second duty – to disclose any information that, if withheld, could damage CTA – that CTA's Behavior Analysts were transferring to Homeplace (taking positions offered by Stephen and Barbara Foreman) is undoubtedly information that, if withheld, could damage CTA. *See Aero*, 507 S.W.2d at 169 (finding a breach where the fiduciary failed to disclose a "forthcoming, simultaneous loss of key employees."). The Court refuses to accept that the potential loss of every Behavior Analyst that CTA employed was information that CTA *could not have* benefitted from – especially where CTA was confident in the merits of its appeal and planned on continuing to pay the analysts. Stephen Foreman's lack of disclosure nevertheless

---

[4] Stephen Foreman curiously argues that he met his duty of disclosure by sharing his actions with Cabinet employee, Pam Taylor. Not only does he fail to point to any authority to suggest that this satisfied his duty of disclosure, but Taylor's testimony suggests that Stephen was less than forthcoming about CTA's plans to continue business and that he was acting without the approval of CTA's executives. DN 82-16.

denied CTA any appreciable opportunity to explain its plans to its Behavior Analysts and clients and persuade them to stay.

In violation of his third duty – to not, while still a fiduciary, set up a competing enterprise – it appears that Stephen set up Homeplace's Behavior Supports program before his employment with CTA ended.  The Supreme Court of Kentucky has explained that a fiduciary "should terminate their position[] . . . when they first make arrangements or begin preparations to compete directly with the employer." *Steelvest*, 807 S.W.2d at 483 (citing *Aero*, 507 S.W.2d at 169.  CTA has presented indisputable evidence showing that the Foremans made arrangements and preparations – copying files, soliciting employees and clients – to transfer CTA's Behavior Support program to Homeplace while they were still employed by CTA.  And to be clear, because CTA's termination was by no means certain at this point, the Foremans do not get the benefit of arguing that Homeplace was not a "competing enterprise" in relation to CTA.[5]

Lastly, CTA asserts that Stephen violated his fourth and fifth duties – to not, after resigning, take CTA's key personnel for the purpose of operating a competitive enterprise or use CTA's fiducial confidences to profit at its expense.  On the former, the record remains unclear as to what number, if any, of CTA's "key personnel" decided to transfer to Homeplace after Lee terminated them on August 2.  Thus, genuine issues of fact exist to that extent.  On the latter, because CTA argues that its client list, client files, and employee files were trade secrets, the "fiducial confidences" aspect of its fiduciary-breach claim is preempted by the KUTSA. *Luvata Electrofin, Inc. v. Metal Processing Int'l, L.P.*, 3:11-CV-00398, 2012 WL 3961226 (W.D. Ky. Sept. 10, 2012) (citing *Greif, Inc. v. MacDonald*, 2007 WL 679040, at *2 (W.D.Ky. Mar.1, 2007)); Ky. Rev. Stat. Ann. § 365.892 (explaining that the KUTSA "replaces conflicting tort,

---

[5] Their arguments are not entirely misguided, however, but are more appropriately related to CTA's underlying causation issues, not whether Homeplace was a "competing enterprise." *See infra* Part K.

restitutionary and other law of [Kentucky] providing civil remedies for misappropriation of a trade secret."). Were these the only duties in question, the "taking key personnel" portion of these claims would remain open. *See Nurses' Registry & Home Health Corp. v. Robinson-Hill*, No. 2010-CA-001224-MR, 2012 WL 1478958, at *3 (Ky. Ct. App. Apr. 27, 2012), *review denied* (Apr. 9, 2014). But in light of the evidence showing that Stephen breached his other duties, we need not go further.

Because CTA has come forth with uncontroverted evidence that Stephen Foreman violated his duties to fully disclose any conflict between his and CTA's interest, to fully disclose information that could damage CTA, and to not set up a competing enterprise while still a fiduciary of CTA, we find that he breached his fiduciary duties as a matter of law. However, CTA still must put forth sufficient evidence showing that these breaches *caused* its damages. This element is discussed below. *Infra* Part K.

## B. Count II: Violations of the KUTSA

All parties have moved for summary judgment on Count Two of the Complaint, which alleges misappropriation of trade secrets in violation of the Kentucky Uniform Trade Secrets Act ("KUTSA"), Ky. Rev. Stat. Ann. § 365.880 *et seq*. To prevail under the KUTSA, plaintiffs must show 1). misappropriation, and 2). that the misappropriated information qualifies as a trade secret. *Auto Channel, Inc., et al. v. Speedvision Network, LLC, et al.*, 144 F.Supp.2d 784, 794 (W.D. Ky. 2001). To that end, CTA argues that the Defendants misappropriated its client list, client files, and employee files. The Defendants argue that CTA has put forth insufficient evidence showing that the information at issue was a trade secret *and* that the Defendants misappropriated it.

19

### 1. Were CTA's Client List, Client Files, and Employee Files Trade Secrets?

The KUTSA defines a trade secret as information that derives economic value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can readily obtain economic value from its disclosure or use." *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005) (citing Ky. Rev. Stat. Ann. § 365.880).  The definition further requires that the information be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ky. Rev. Stat. Ann. § 365.880.  CTA contends that its client list, client files, and employee files are trade secrets subject to the KUTSA's protection.  Their reasoning relies, in part, on the fact that these document compilations were kept under "double lock and key" and were valuable in the industry.  Additionally, they point out that the Foremans' Confidentiality Agreements specifically required them to "take reasonable means to protect the security of," and not "take" or "reveal" at the termination of their employment, any "PHI" – defined as all protected health information. DN 89-12.  And that Stephen Foreman's employment agreement with Homeplace even contemplated his protection of "compilations . . . and lists of actual or potential customers which the Employer or its affiliates takes reasonable efforts to protect from disclosure" must counsel in favor of such a list being a trade secret, they contend. DN 89-18.

The Defendants argue that CTA's client files cannot be a trade secret because the Cabinet and CTA's Behavior Analysts could readily ascertain that information by proper means; but the Court is unpersuaded.  First, surely the Cabinet is not one who "can readily obtain economic value from [the information's] disclosure or use."  If the Court accepted this argument, no trade secret could ever exist where the information in question was registered with, or subject to inspection by, a governmental agency.  Second, that CTA's employees had access to their individual clients' information in their professional capacities is distinct from a situation where

20

each employee had access to *all* client information. *See WCP/Fern Exposition Servs., LLC v. Hall*, 3:08-CV-522, 2011 WL 1157699, at *4, *9 (W.D. Ky. Mar. 28, 2011) (finding genuine issues of fact as to "ready obtainability" where few employees had access to data).   In other words, the record reveals that, while one Behavior Analyst may have had access to the file of a specific client with whom he or she was working, the assemblage or compilation of *all* client files was kept under "double lock and key" at the Foremans' home office.   Further, to the extent employees did maintain or hold specific clients' information, they, like the Foremans, were subject to the KUTSA and HIPPA's non-disclosure requirements. *See* 45 C.F.R. § 160.103 (explaining that "protected health information means individually identifiable health information.").   Because we have no evidence contradicting CTA's showing that this information was not of general public knowledge, we find that it is a trade secret. *See Hartley v. Dayton Computer Supply*, 106 F. Supp. 2d 976, 986 (S.D. Ohio 1999); *JPMorgan Chase Bank, N.A. v. Clark*, 09-13815, 2009 WL 3190342 (E.D. Mich. Sept. 29, 2009).[6]

The same reasoning extends to Court's finding that CTA's client list is a trade secret. Though every employee or third-party case manager could identify which of their personal clients belonged to CTA, it does not necessarily follow that they could identify and compile a list *each and every* CTA client through proper means.   In *ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005), in fact, the court named "lists of . . . purchasers of unusual goods or services not generally known to an industry at large" as a type of client list that courts have viewed as *not* "readily obtainable by proper means." (citing *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521, 66 Cal. Rptr. 2d 731, 735 (Cal. Ct. App. 1997)).   Behavioral supports for mentally challenged and disturbed individuals are certainly

---

[6] The Court acknowledges that these cases apply Ohio and Michigan law, respectively, but, because they have both adopted the UTSA, their decisions provide guidance for application and construction of the KUTSA. *Auto Channel, Inc.*, 144 F.Supp.2d at 788.

a service whose purchasers are not generally known to the industry at large. *See* 45 C.F.R. § 164.502 (prohibiting disclosure of personal health information except in narrow circumstances). Further undermining the Defendant's arguments is that Stephen's employment agreement with Homeplace specifically contemplates that such a list is a trade secret. DN 89-18.

Turning to CTA's employee files, the record shows that these files contained, at a minimum, resumes, background checks, Tuberculosis (TB) Assessments, and general employee information. Though the logistics are uncertain, what is also clear is that Homeplace used these files to facilitate the swift transfer of CTA's Behavior Analysts from CTA to Homeplace instead of obtaining this information directly from the Analysts with their consent. Homeplace derived economic value through this transfer from not having to gather the resumes, conduct background checks and TB Assessments, or obtain any of the information that was transmitted to it. So the employee files, like the client files and client list, were trade secrets.

In light of the substance of this information and the measures CTA took to keep it private, we determine that CTA's client list, client files, and employee files were trade secrets within the meaning of the KUTSA. Although this is generally a question of fact, *KCH Servs., Inc. v. Vanaire, Inc.*, No. 05–777–C, 2008 WL 4401391, at *2 (W.D. Ky. Sept.24, 2008), no rational juror could find that these items are not trade secrets. However, to grant CTA's motion on this count, we must also assess whether any alleged trade secrets were misappropriated by the Foremans or the Clevenger Defendants.

### 2. Misappropriation

Under the KUTSA, "[t]o prove misappropriation, Plaintiffs must [generally] show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent." *Spectrum Scan, LLC v. AGM California*, 519 F. Supp. 2d 655,

657 (W.D. Ky. 2007) (citations omitted). The KUTSA then defines misappropriation as including the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy." Ky. Rev. Stat. Ann. § 365.880(2)(b)(2)(b).

### a. Did the Foremans Misappropriate this Information?

Here, the record reveals that Stephen Foreman emailed Clevenger on the day CTA received the Notice of Termination and stated that he was "[c]opying employee files now." DN 89-27. On August 1, Stephen also relayed that he had "copied all the client files" despite his continued employment with CTA and knowledge that CTA planned to appeal the Notice and continue business as usual. DN 89-26; DN 82-5, p. 142. It is undisputed that Homeplace received the files. This evidence, coupled with the confidentiality and employment agreements Stephen signed and his admission that he copied the information in question, proves that Stephen Foreman disclosed CTA's client files, client lists, and employee files to Homeplace without CTA's consent and at a time where he should have known he was bound to maintain their confidentiality.

Regarding Barbara Foreman, however, there is a complete lack of evidence indicating that she misappropriated CTA's files or client list. In fact, the only portion of the record that CTA cites to as evidence that Barbara Foreman "transferred files" to Homeplace reveals only that she transferred client files to Homeplace *after* those clients consented to such a transfer. DN 82-16, p. 75. Nor has CTA shown that it had required her to sign an employment agreement that specifically named "lists of actual or potential customers" as a trade secret, like it had with

Stephen Foreman.  Therefore, even viewing the record in a light most favorable to CTA, there is insufficient support it's KUTSA claim against Barbara Foreman.

Having found that Stephen Foreman misappropriated CTA's trade secrets, we still must assess the causation element underlying CTA's right to recover damages.  *Infra* Part K.  We do so below.  However, the claim against Barbara Foreman's has already failed and we will grant her motion to that extent.

### b.  Did the Clevenger Defendants Misappropriate this Information?

Turning to the Clevenger Defendants, the record is unclear about *when* Homeplace received authorization to use CTA's client and employee files from those employees and clients, creating a genuine issue as to whether Homeplace "used [the information] without proper consent." *Spectrum*, 519 F. Supp. 2d at 657.  Moreover, the KUTSA defines misappropriation as the "use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of that trade secret." Ky. Rev. Stat. Ann. § 365.880(2)(b)(1).  Critical here, it defines "improper means" to include "inducement of a breach of a duty to maintain secrecy." *Id.*  § 365.880(1).  Looking at the record, Stephen Foreman indicated that he was "[c]opying employee files," and Clevenger requested that he "start sending [her] the personnel files so that [Homeplace] can get things going." DN 89-27.  He also reported having "copied all the client files" in response to her asking, "What do you want to do about the client transfers?" DN 82-26.  A reasonable jury could view these statements as having induced Stephen Foreman's breach of secrecy.  However, summary judgment is not appropriate until we discuss the adequacy of CTA's proof of on the damage causation issue. *Infra* Part K.

24

### C. Counts III and IV: Tortious Interference with Contract and Prospective Business Advantage

All parties having moved for summary judgment on Counts III and IV, CTA alleges that the Foremans and the Clevenger Defendants tortiously interfered with any contractual and/or prospective business arrangements with its Behavior Support clients, referral sources (case managers), and employees. Because Kentucky courts have adopted the Restatement (Second) of Torts definition of both torts, there the Court will begin.

The Restatement explains that "Intentional Interference with Performance of Contract" occurs under the following circumstances:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979). CTA's claim must fail on this ground, however, because two essential elements of the claim are the "*existence of a contract* between the plaintiff and a third party and a *subsequent breach* of the contract by the third party." *Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir. 1977) (citing *Walt Peabody Advertising Serv. Inc. v. Pecora*, 393 F.Supp. 328, 331 (W.D. Ky. 1975)). Here, CTA has argued that only two contracts were breached during the events in question: Stephen and Barbara Foremans' Confidentiality Agreements. As discussed below, *infra* Part J., those agreements fail for lack of consideration. CTA's claims for tortious interference of the same contractual relationship must, resultantly, fail as well.

Next, the Restatement explains the tort of "Intentional Interference with Prospective Business Relations" as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other

25

for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of: (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979).  Of particular relevance to CTA's claims is the term "improperly interferes," which Kentucky courts have construed as requiring that any "interference [be] malicious or without justification, or [be] accomplished by some unlawful means such as *fraud*, deceit, or coercion." *Steelvest*, 807 S.W.2d at 487 (citing *Derby Road Building Co. v. Commonwealth, Dept. of Highways,* Ky., 317 S.W.2d 891 (1958); *Brooks v. Patterson,* 234 Ky. 757, 29 S.W.2d 26 (1930) (emphasis added)).  Causation is also an undisputed element of this tort.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995).

### 1.  Did the Foremans Improperly Interfere?

The crux of the Restatement's inquiry would appear to be whether a defendant "ha[d] a *valid reason* for taking the challenged action," the existence of which "will not generally result in the defendant's liability." *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988). Yet, the Supreme Court of Kentucky has unequivocally held "as a matter of law, that a breach of a fiduciary duty is equivalent to fraud" for purposes of this tort. *Steelvest*, 807 S.W.2d at 487.  So while the record indicates that the Foremans' actions may have been spurred by legitimate and arguably honorable aims – namely, preventing a lapse in the treatment of emotionally disturbed or disabled clients, seeking employment for analysts whom they believed would be soon unemployed, and, generally speaking, detaching their careers from what appeared to be a sinking ship – our finding that Stephen Foreman breached his fiduciary duties mandates a finding that he "improperly interfered." *See ATC*, 402 F.3d at 717.  Regarding Barbara Foreman, however, our previous

26

finding dictates the opposite conclusion: in the absence of a fiduciary breach, her interference was not improper.

Stephen Foreman argues in the alternative that, even if his actions were "improper," he may "escape liability by showing that [he] acted in good faith to assert [] legally protected interest[s] of his own." *Dennison v. Murray State Univ.*, 465 F. Supp. 2d 733, 756-57 (W.D. Ky. 2006) (citing *Hornung*, 754 S.W.2d at 858). To that end, he claims that two legally protected interests validated any unlawful actions: 1). his ethical and professional obligations, as a licensed and Board Certified behavioral analyst, to take all necessary steps to prevent a lapse in his clients' coverage, to "[p]repare the client[s] for termination," and to "offer to assist the client in obtaining services from another professional" upon termination, 201 KAR 43:040 §§ 5(2)(a), 5(2)(b)(2); and, 2). the Notice warned that "[a]ny efforts . . . to disrupt or impede the orderly relocation of the [clients] . . shall be subject to any and all remedies provided by law." DN 89-24.

However, the Court finds Stephen Foreman's good-faith arguments to be without merit. First, the ethical duties asserted specifically arise upon "termination of [the clients'] services," 201 KAR 43:040, and Stephen took most of these actions *before* the Notice of Termination's effective date and others before the Cabinet had even issued the Notice. Second, that the letter threatened legal action if anyone "disrupt[ed] or imped[ed]" client relocation did not give Stephen a license to affirmatively and tortiously solicit CTA's clients and employees. Consequently, no rational jury could find that Stephen Foreman acted in good faith to assert legally protected interests, and this argument must fail

In brief, we will grant Barbara Foreman's motion on the ground as discussed above. Regarding Stephen, however, resolution CTA's claims on Count IV still depend on our causation discussion below. *Infra* Part K.

27

### 2.   Did the Clevenger Defendants Improperly Interfere?

The Clevenger Defendants will meet the same fate as Barbara Foreman on this Count. Even a dim view of the record reveals that the Clevenger Defendants were "simply attempting to advance [their own] legitimate economic interests at the expense of another's," *ATC*, 402 F.3d at 717, not "intentional[ly] interfere[ing] without justification."   Restatement (Second) of Torts § 766, cmt. s (1979).   The tort of interference with prospective contractual relations does not prohibit competitive enterprises from seizing opportunities to expand, and the record does not reveal that the Clevenger Defendants possessed any contrary motive. *See Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 967 (6th Cir. 2007).   Moreover, unlike the Foremans, there are no allegations that the Clevenger Defendants breached fiduciary duties so as to supply the "unlawful means" or impropriety that this tort requires.   Accordingly, any interference by the Clevenger Defendants was not improper, and the Court will grant their motion for summary judgment as to Counts III and IV.

### D.  Count V: Violations of Kentucky Law

The Foremans and the Clevenger Defendants have separately moved for summary judgment on Count V.  In that claim, CTA seeks civil damages under the right granted to it under Ky. Rev. Stat. Ann § 446.070 for the Defendants' alleged violations of (i) Ky. Rev. Stat. Ann § 216.2950; (ii) Ky. Rev. Stat. Ann § 205.8463; (iii) 907 KAR 1:671, as informed by Ky. Rev. Stat. Ann § 205.8451; and, (iv) Ky. Rev. Stat. Ann § 205.8477, as supplemented by 907 KAR 1:672.   In its consolidated response to both the Foremans' and the Clevenger Defendants' motions for summary judgment, however, CTA neither attempts to rebut the Defendants' arguments that no violations have occurred nor cites to the record to create a genuine issue as to

the violations or damages.  As such, Fed. R. Civ. P. 56 dictates dismissal of Count V as to all Defendants on this basis.

### E.  Count VI: Fraud by Omission

All parties have moved for summary judgment on this count.  Although the Complaint alleges that all of the Defendants are liable for fraud by omission, CTA only argues that the Foremans are liable on that basis. DN 89-1, p. 32.

To prevail on a claim of fraud by omission under Kentucky law, a plaintiff must prove: 1). that the defendants had a duty to disclose a material fact; 2). that defendants failed to disclose that fact; 3). that the defendants' failure to disclose that fact induced the plaintiff to act, and; 4). that the plaintiff suffered actual damages. *Smith v. General Motors Corp.*, 979 S.W.2d 127 (Ky. App 1998). Relevant here, a duty to disclose facts is created where a confidential or fiduciary relationship between the parties exists. *Dennis v. Thomson*, 240 Ky. 727, 43 S.W.2d 18 (Ky. 1931).  However, CTA has not even attempted to put forth any evidence showing how Defendants' failure to disclose any information "induced the plaintiff to act."  The Court will grant summary judgment on Count VI as to all Defendants, as CTA has not met its burden under Fed. R. Civ. P. 56.[7]

### F.  Count VII: Aiding and Abetting/Civil Conspiracy Counts I and VI

CTA alleges that the Clevenger Defendants are jointly and severally liable for the Foremans' breach of fiduciary duties and fraud because the Clevenger Defendants aided and abetted the Foremans' unlawful activities, which is, according to CTA, "akin to a claim of civil conspiracy."  Because CTA's fraud claim fails as a matter of law, however, the only activity that

---

[7] CTA has not put forth any evidence that the Clevenger Defendants owed it any fiduciary duties or failed to disclose information to it in degradation of those duties.

29

the Clevenger Defendants could have aided and abetted is Stephen Foreman's breach of fiduciary duties.[8]  Before delving into that analysis, the Court takes this opportunity to clarify a point of law.

As CTA has somewhat alluded, there is no legal distinction between aiding and abetting the breach of fiduciary duties and a civil conspiracy to breach fiduciary duties. *See Steelvest*, 807 S.W.2d at 485 (treating aiding, abetting and conspiring with another to breach a fiduciary duty as one claim); *Stanley Warranty, LLC v. Universal Adm'rs Serv.*, Inc., 3:13-CV-513-JGH, 2014 WL 4805669, at *1 (W.D. Ky. Sept. 26, 2014) (referring to such a claim as "aiding and abetting a breach of fiduciary duty – civil conspiracy.").   In fact, both claims involve a defendant "know[ing an]other's conduct constitutes a breach of duty and giv[ing] substantial assistance or encouragement to the other so to conduct himself." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (quoting *Farmer v. City of Newport*, 748 S.W.2d 162 (Ky.App.1988)).   As recognized by our sister court, such a claim is appropriately analyzed as an aiding-and-abetting claim. *Gundaker/Jordan Am. Holdings, Inc. v. Clark*, Civ. No. 04-226-JBC, 2008 WL 4550540, at *4 (E.D. Ky. Oct. 9, 2008) (calling *Peoples Bank of N.Ky., Inc. v. Crowe Chizek & Co. LLC* into question for ignoring the Kentucky Supreme Court's decision in *Steelvest*); *see also Steelvest*, 807 S.W.2d at 485 (recognizing a claim for aiding and abetting the breach of fiduciary duties).  Because the Plaintiff has framed its civil conspiracy and aiding and abetting allegations as one claim, that Court will address it as one claim, using the Kentucky Supreme Court approved aiding-and-abetting framework.

Accordingly, the Court turns to a more pointed question to address the merits of Count VII: did the Clevenger Defendants aid and abet Stephen Foreman's breach of fiduciary duties?

---

[8] The Court disagrees with CTA's conclusion that if one aids and abets the breach of a fiduciary duty, he or she has also necessarily aided and abetted fraud.  CTA takes the *Steelvest* court's proclamation that "a breach of fiduciary duty is equivalent to fraud" out of context.  *Steelvest*, 807 S.W.2d at 487.

To prevail, CTA must show the following: 1). that Stephen breached his fiduciary duties; 2). that the Clevenger Defendants gave "substantial assistance or encouragement" to him; and, 3). that the Clevenger Defendants "'kn[ew] that [Stephen's] conduct' breached a fiduciary duty." *Miles*, 595 F.3d at 666 (quoting Restatement (Second) of Torts § 876(b)); *see also Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 533 (6th Cir. 2000). Clarifying the third element, the Sixth Circuit has explained that a plaintiff in CTA's position must show that the defendant had *actual*, not constructive, knowledge that it was aiding conduct that breached fiduciary duties. *Miles*, 595 F.3d at 666 (citations omitted). In other words, CTA must put forth evidence that the Clevenger Defendants knew that Stephen Foreman owed fiduciary duties *and* that he breached them. We find genuine issues in that regard.

First, there is some evidence suggesting the Clevenger Defendants knew Stephen Foreman owed any fiduciary duties to CTA. Although "Program Director" – Stephen's title – is not a position one could classify as a "classic fiduciary" like a director or officer, *see Steelvest*, 807 S.W.2d at 483, the record reflects that Stephen was the highest-ranking CTA employee in Kentucky. In fact, Clevenger approached Stephen about transferring CTA's Behavior Supports division to Homeplace, not any other employee at CTA. Equally important, her e-mail exchanges with Stephen apprised her of his access to CTA's client and employee files. *See* DN 89-27; DN 89-28. And although there is no evidence showing that she was aware Stephen had signed a Confidentiality Agreement, such knowledge would have been gratuitous when one considers what she had "actual knowledge" of: his position, authority, and access to confidential information.

So did the Clevenger Defendants have "actual knowledge" that Stephen *breached* these duties? According to Stephen Foreman, Clevenger "was aware of everything" that occurred

between the murder and his leaving CTA. DN 82-1, p. 144.   She offered the Foremans employment before the Notice of Termination letters were sent, offered CTA's Behavior Analysts employment after, asked Stephen to send her CTA's personnel files while he was still CTA's Program Director, and told him to resort to personal email to "keep . . . in good standing with Comm. Ties."   Surely this is evidence from which Clevenger could infer that the fiduciary, Stephen, took affirmative steps antagonistic to CTA's interest before he quit. *See Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 667-68 (6th Cir. 2010).   On the other hand, Stephen Foreman *had* given Clevenger every indication that CTA was "closing," so it is possible that she believed that CTA had no interest remaining or that Stephen was not acting contrary to that interest.   And Clevenger's industry experience gave her no reason to question Stephen's representation, because every time she had seen the Cabinet terminate a Medicaid provider agreement, that provider's therapists and clients transitioned to a new provider shortly thereafter. What is more, the record is devoid of any evidence showing that the Clevenger Defendants were aware that CTA would appeal the termination.   In the end, there is competing evidence on both sides.

All of this leads the Court to conclude that the record reflects genuine issues on the "actual knowledge" element of CTA's aiding-and-abetting claim.   As such, whether the Clevenger Defendants are entitled to summary judgment depends on CTA's proof of damage causation as discussed below. *Infra* Part K.

### G. Count VIII: Unjust Enrichment/Quantum Meruit/Restitution

Only the Defendants have moved for summary judgment on Count VIII.   In this claim, CTA alleges that the Defendants wrongfully took property and business interests away from it without providing compensation or consideration, rendering them liable for unjust enrichment

and *quantum meruit*.[9]   To recover under a theory of unjust enrichment or *quantum meruit*, a claimant must show: 1). that a benefit was conferred upon the defendant at the plaintiff's expense; 2). that the benefit resulted in an appreciation by the defendant; and, 3). that the benefit was accepted under circumstances which render its retention, by the defendant without payment of the value thereof, inequitable. *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1380-81 (W.D. Ky. 1987) (citations omitted).   CTA cites no evidence that would tend to prove these elements, especially that the Defendants accepted a benefit under circumstances which render its retention inequitable.   Therefore, in accordance with this lack of proof, the Court will grant the Defendants motion for summary judgment on CTA's claim for unjust enrichment or *quantum meruit*.

## H.  Count IX: Unfair Competition

The Defendants have moved for summary judgment on Count IX, in which CTA claims that the Defendants should be liable for unfair competition.   CTA contends that unfair competition occurred by virtue of the Defendant's misappropriation of its agreements, employees, local operating structure, management, clients, etc.

Kentucky has only recognized the claim of unfair competition in the realm of trademarks, however, and defines it as the "passing off, or attempting to pass off, upon the public the goods or business of one man as being the goods or business of another." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789-90 (W.D. Ky. 2001) (quoting *Newport Sand Bank Co. v. Monarch Sand Min. Co.,* 144 Ky. 7, 137 S.W. 784, 785 (1911)).   In fact, the whole theory of unfair competition is the prevention of "actual or intended deception of the

---

[9] Although ambiguously framed in the Complaint, the Plaintiff's briefing makes clear that it is asserting a claim for restitution based upon a theory of either quantum meruit or injust enrichment.  Restitution would be an appropriate form of relief for such claims. *See Cheyenne Res., Inc. v. Elk Horn Coal Corp.*, 265 S.W.3d 184, 186 (Ky. 2008)( citing *Restatement (First) of Restitution,* § 74 (1937)).

public for business reasons." *Covington Inn Corp. v. White House Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969) (citation omitted).  Here, however, the record does not support any finding that the Defendants intended to deceive the public or pass off CTA's business as its own.  And to the extent CTA's unfair competition claims sounds in the misappropriation and use of trade secrets, they are preempted by the KUTSA.  *Auto Channel*, 144 F. Supp. 2d at 789-90.  The Court will grant the Defendants' motions for summary judgment on Count IX for these reasons.

## I.  Count X: Conversion

In its tenth claim, CTA charges that the Defendants converted CTA's confidential business, client, and personnel files by copying the files off of the Foremans' CTA laptops.  The Defendants have moved for summary judgment on this Count.

Under Kentucky law, the elements of a conversion claim are: 1). ownership rights in certain property; 2). the wrongful act of taking or disposing of property; and, 3). causing damages. *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005) *aff'd*, 279 F. App'x 378 (6th Cir. 2008).  Focusing on the second element, the fundamental flaw in CTA's conversion claims is that the Defendant's possession of *copies* of the files – as opposed to the files themselves – does not amount to an interference with the CTA's property sufficient to constitute conversion. *See FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 303-04 (7th Cir. 1990).  This is so because the tort of conversion requires an unauthorized taking or dispossession *to the complete exclusion* of the rightful possessor, not a mere temporary interference with property rights. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Pearson v. Dodd*, 410 F.2d 701, 706–08 (D.C. Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969).  While some states have decided to expand common law

34

conversion to include such activity, *see, e.g.*, *Warshall v. Price*, 629 So. 2d 903, 905 (Fla. Dist. Ct. App. 1993) (holding that a person need not deprive another of exclusive possession of their property to be liable for conversion), the Court finds no law indicating that Kentucky is one of them.

In fact, Kentucky's modern conversion claim arose from two common law writs that specifically contemplated a defendant's *exclusive possession* of the property in question: "trover" and "trespass." *Motors Ins. Corp. v. Singleton*, 677 S.W.2d 309, 314 (Ky. Ct. App. 1984). Trover provided *recovery of property* from one who had no legal right to the property but whose initial possession was not wrongful; trespass dealt with *recovery of property* that was initially and continually held wrongfully. *Id.*   Neither writ, the two of which eventually merged to become "conversion," contemplated that a plaintiff could seek recovery of property that he or she never lost possession of.   And while the Court understands that the law must adapt to technology, it is our role to apply Kentucky law as it exists, not to amend it. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).   Accordingly, there are no genuine issues of fact on CTA's conversion claim, and we will grant the Defendants' motions for summary judgment on Count X.

### J.   Count XI: Breach of Contract

Next, CTA alleges that the Foremans breached Confidentiality Agreements that they willingly entered into during their employment with CTA.   The Court need not assess the merits of any alleged breach, however, because the Foremans have sufficiently demonstrated that both agreements fail for lack of consideration.   Framing our analysis is the undisputed fact that the Foremans signed the agreements in question after their initial employment with CTA, not as a prerequisite to employment.

35

CTA's breach-of-contract claims are ultimately without merit because they allege that the Confidentiality Agreements hollow because were "supported by continued employment as valid consideration." DN 89-1, p. 39.   As early as 1981, Kentucky law has required that an employment agreements signed by employees *after the date of his or her initial employment* must be supported by *more* than just continued employment to be enforceable. *Cent. Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, 622 S.W.2d 681, 685 (Ky. Ct. App. 1981).   That court explained that consideration would only exist to support the agreement if the employee was employed for an "appreciable length of time" after its signing. *Id*.   Yet, here, CTA has not even argued that the Foremans' continued employment was appreciable.   Nor could it, as the record reveals that CTA only employed the Foremans for only fourteen (14) weeks after they signed the agreement at issue.

More to the point, the Supreme Court of Kentucky recently described what is required to satisfy Kentucky's consideration requirements in this context. *See Charles T. Creech, Inc. v. Brown*, 433 S.W.3d 345, 354 (Ky. 2014).   In *Creech*, it explained that the "common thread running through" cases on the issue is that "after the []provision was signed, whether as part of a larger employment contract or as a stand-alone document, the employment relationship between the parties [had to] change" to establish consideration. *Id*.   It held that this "change" might include the employer's elevating the employee from at-will status to something more, or the employee's receipt of specialized training, a promotion, or increased wages – so long as there was some sort of change. *See id*. To state this rule another way: for an employee agreement signed after initial employment to be enforceable, the circumstances of his or her employment must be altered by the agreement or change thereafter.

36

Here, CTA has failed to allege any facts demonstrating that the Foremans' employment relationships changed in any way after they signed the Confidentiality Agreements in question. Consequently, both agreements must fail for lack of consideration and are unenforceable as a matter of law.  The Court will therefore grant the Defendants' motions for summary judgment on the breach of contract claim in Count XI.

### K. Proof of Causation

In addition to their count-specific arguments, which we have addressed above, the Defendants contend that they are entitled summary judgment because CTA has put forth inadequate proof of causation on *all claims*.  Specifically, they argue that causation is a requirement of each of CTA's claims and that such proof is lacking altogether.  The Plaintiff does not dispute that causation is, to some extent, an element of each of its claims against the Defendants. *See* DN 87-1; DN 108.  We are ultimately persuaded that CTA's claims fall as a matter of law on this basis.

Under Kentucky law, a plaintiff may establish causation by direct or circumstantial evidence. *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972). Reasonable inferences of causation from circumstantial evidence are permissible, but the type of evidence that will support a reasonable inference must indicate the *probable* as distinguished from a *possible cause*. *Martin*, 561 F.3d at 443 (citing *Briner v. General Motors Corp.*, Ky., 461 S.W.2d 99) (emphasis added).  To the extent such inferences are fact-specific, the Supreme Court of Kentucky has acknowledged the following:

> While quantifying the damages that a corporation incurs when a [fiduciary breaches his duties] is not an easy task, courts in other jurisdictions have tackled the task. *See, e.g., B & L Corporation v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189 (Tenn. App. 2004); *Monotronics Corp. v. Baylor*, 107 Ill.App.3d 14, 62 Ill.Dec. 760, 436 N.E.2d 1062 (1982). When fiduciary duty breaches are

37

proven, Kentucky trial courts and juries are equally capable of making damage causation determinations on a case-by-case basis.

*Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 201 (Ky. 2013), *as modified* (Feb. 20, 2014).  The Court approaches the Defendants' arguments with these concepts in mind.

CTA's damages – the loss of its Kentucky operations – are apparent; but we are convinced that CTA's collapse was caused, not by any of the Defendants actions, but by: 1). the June 12, 2011 murder of a CTA client by a CTA employee; 2). the Cabinet's Notice of Termination letters terminating CTA and seeking "immediate alternative placement" of CTA's clients; 3). Lee's discharge of all CTA employees retroactive to July 29, 2011; and, 4). CTA's decision to settle its appeal.  Put another way, any inference of causation reasonably drawn from CTA's evidence does not implicate the Defendants – CTA was the catalyst of its own damages, the Cabinet responded within the bounds of its authority, and the Defendants reacted and seized an opportunity.  That the Defendants' may have looted a sinking ship does not mean that they are responsible for sinking it.  CTA has simply not presented enough evidence of causation to survive summary judgment.

Speaking literally and legally, CTA began suffering damages in this case when its employee Tyler Brock killed Shawn Akridge, a CTA resident, in a group home in Paint Lick, Kentucky.  Brock beat Akridge, a mentally-disabled man, to death as another CTA client, who was also mentally disabled, watched.  As if this were not heinous enough, Brock then wrongfully blamed the death on another CTA client named Chester Watkins, who has an IQ of approximately 55.  This attempted cover-up caused Watkins to spend a week in jail.  News coverage was neither scarce nor amicable. *See* DN 82-2, p. 26; DN 82-5, p. 57.  CTA's troubles were only beginning.

The Cabinet responded swiftly by placing CTA on its second moratorium in six months, an act that would prevent CTA from taking on new clients.  So as of this moratorium, CTA's ability to continue operations in Kentucky, which inarguably depends on serving clients, turned on its ability to either maintain its current client base or have the moratorium removed.[10]  But the moratorium was never removed.  Instead, the State's investigation ended in the indictment of Tyler Brock for murder.  The Cabinet then took action and issued the July 26 Notice of Termination letter to "protect the health, safety, and well being of residents who have been placed under [CTA's] care." DN 89-25.  The letter decreed that CTA's certification as a SCL provider would terminate on July 29, 2011, and cited 907 Ky. Admin. Regs. 1:671 Section 6(19) as the authority allowing it to *immediately* terminate CTA's enrollment in the SCL program.  The Cabinet invoked this section based on its conclusion that immediate, as opposed to a delayed, termination was appropriate given its concerns about the "health, safety, and well being" of CTA residents. *Id*.

In light of the impending termination, the letter went on to explain that the Cabinet would be "seeking *immediate alternative placements* for the SCL recipients served by [CTA]." (emphasis added).  And on June 29, it even extended the termination date to August 2, 2011 in order "to allow for a safe transition of five [clients] still residing in homes owned and operated by [CTA]."  So as of the letters – a time when the Cabinet had prevented CTA from taking on new clients and was actively seeking to transfer its current clients – CTA's ability to continue

---

[10] True, CTA did maintain some private clients that paid out-of-pocket, but its revenue from these clients comprised less than 1% of CTA's Kentucky revenue in 2011 and accounted for only roughly 10% of what it paid *monthly* in wages.  *See* DN 90-1; DN 82-15, p. 181-84.

*serving SCL clients* (around 97% of its yearly revenue)[11] rested upon whether it could prevent the Cabinet from carrying out the termination.  CTA nevertheless failed to stop it.

CTA makes much of the fact that Stephen Foreman told the Cabinet that CTA's clients were transitioning – as if suggesting that, absent Stephen's actions, the Cabinet would have sat by and let CTA's near 180 clients that depend on these services go without care.  *See* 82-5, p. 41. However, the record reveals e-mails between Cabinet employees demonstrating that they were actively seeking alternative placement for CTA's clients; in fact, they only halted their efforts and concerns upon learning that the clients would be transferring to Homeplace without Cabinet interference.  Equally important, Cabinet records also reveal that, because CTA could no longer "provide [or] bill for SCL supports" as a result of termination, the case managers for each non-residential client had the ultimate responsibility of finding alternative placement for that client. DN 82-15, p. 13.  Put simply, the Cabinet called for "immediate alternative placement" of CTA's clients in its Notice of Termination letter and warned CTA not to interfere, and the clients' case managers upheld their responsibility by transitioning the clients – individuals who required services that the Cabinet said CTA could no longer provide – to another provider.  The Defendants just happened to present that alternative provider.  Aside from speculative and conjectural claims, CTA has presented no evidence showing that the Defendants were a "but for" cause of, a "substantial factor" in causing, or any other cause of this transition.  CTA's argument is analogous to a fugitive turning himself in to police then later arguing that had he not turned himself in, the police would have decided not to arrest him.  But they cannot blame the Defendants for doing something that was going to occur anyway, and we reject any argument

---

[11] The Defendants point out that CTA has presented no evidence showing how it would survived financially without Medicaid reimbursements.  Because CTA has not rebutted this showing, Fed. R. Civ. P. 56(c) and (e)(2) permits the Court to find that CTA's inability to survive with Medicaid reimbursements is undisputed for purposes of summary judgment.

along those lines.  Thus, we turn to the crucial question: has CTA shown that it would have prevented the Cabinet from ever carrying out the termination and seeing client transitions through?

To that end, CTA argues that it would have paused the termination and resultant transition of clients because it filed a timely appeal on August 1, a day before the termination's effective date.  That filing, it argues, effectively "stayed" the termination and, had the Defendants not "stolen" its business, would have allowed CTA to continue serving SCL clients during its appeal.  CTA also believes that any amount it would have earned for SCL services during the "stay" would have gone into escrow and that it would have been entitled to those funds if they won their appeal.  It maintains that this stay-and-escrow mechanism exists as a creature of the SCL regulations.  Setting aside the highly speculative claim that CTA would have won its appeal, which we need not reach, we look to the SCL regulations to assess whether CTA's appeal could have triggered the alleged "stay" and escrow of funds.

Because our assessment of the SCL regulations requires us to interpret text that addresses purely state-law issues on which Kentucky's highest court has yet to issue an opinion, our job is to predict how that court would interpret and apply them. *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir.2008).  After thorough analysis, we believe the Supreme Court of Kentucky would reject CTA's position because it contradicts the SCL regulations' plain language, would create inconsistencies within them, and would render several of their provisions meaningless. *Stephenson v. Woodward*, 182 S.W.3d 162, 171 (Ky. 2005), *as modified* (Jan. 19, 2006); *Lewis v. Jackson Energy Cooperative Corporation*, 189 S.W.3d 87 (Ky.2005) (explaining that "[t]he courts will not interpret a portion of a statute in a way that would render other parts of the same statute or the larger statutory scheme meaningless.").  That analysis is as follows.

41

We begin with a plain-meaning assessment of the SCL regulations.  These regulations, which govern a Medicaid provider's participation in the SCL program, contain a Section titled "Termination of Provider Participation." 907 Ky. Admin. Regs. 1:671.  Because we are dealing with the Cabinet's termination of CTA's participation, this is the logical place for us to begin.  Subsection 1 of this Section, titled "Terminations and hearings," states the following:

> Before the participation of a nursing facility . . . or an intermediate care facility for the mentally retarded . . . is terminated, it shall have the right to receive an administrative hearing. . . . [*In all other cases*] provider participation shall be terminated *without prior hearing*.

907 Ky. Admin. Regs. 1:671 Section 6(1) (emphasis added).  Here, CTA was not, and does not claim to have been, a nursing or intermediate care facility, so it is plain that the Cabinet was empowered to terminate it without prior hearing – CTA will have quite a hurdle arguing otherwise.  Further, Subsection 19 in the same "Termination" Section provides that "[t]he department may terminate a provider *immediately*, if necessary to protect the health, safety, or well-being of Medicaid recipients." 907 Ky. Admin. Regs. 1:671 Sections 6(19) (emphasis added).  This is indisputably the language that the Cabinet invoked in terminating CTA.  So that the Cabinet was going to terminate CTA immediately and without a prior hearing is unambiguous, but what does it mean for a provider to be "terminated?"   Would it actually prevent CTA from continuing to provide SCL services?

The regulations explain, with the utmost clarity, that "Terminated" "means a provider's participation in the Medicaid Program *has been ended*, and that a *contractual relationship no longer exists* between a provider and the department for the provision of Medicaid covered services to Medicaid eligible recipients by that individual, agency, entity, [etc.]" *Id.* (emphasis

added).[12]   Applied to CTA's situation, this would mean that CTA's *participation* in the SCL program *ended* on August 2, 2011 and its contract with the Cabinet ceased to exist.  Where this language is so plain, CTA's only hope to overcome it would be to point to other language in the regulations that clearly modified or excepted them from it.  Its laudable attempts to do so fail.

CTA argues that Section 10(3)(a) of these regulations, titled "Actions Taken at the Conclusion of the Administrative Appeal Process," provides the stay-and-escrow mechanism alleged.  This Section, which explicitly deals only with Cabinet actions taken *after appeal*, would be a curious place to insert the mechanism alleged; and our analysis of this Section reveals that it is simply not there.  Subsection (3)(a), on which CTA relies, provides that "Thirty (30) calendar days after the issuance of a final order pursuant to Ky. Rev. Stat. Ann. § 13B.120, the department . . . [m]ay enact program terminations, sanctions pursuant to 42 U.S.C 1320a-7, or other actions that were held in abeyance pending the decision of the administrative appeal process."  CTA asks us to interpret this provision alone as declaring that *all terminations* are held in abeyance pending resolution of *any* administrative appeal filed as a result.

---

[12] CTA points to an Information Bulletin from the United States Department of Health and Human Services as persuasive authority for interpreting this definition beyond its plain language.  DN 126-1.  That bulletin refers to 42 CFR § 455.101 (2006), which specifically defines "Termination" as when "a State Medicaid program . . . has taken action to revoke the provider's billing privileges, and the provider has exhausted all applicable appeal rights or the timeline for appeal has expired."  But that definition specifically refers to a "termination" based on a provider's failure to make disclosures that are required under those federal Medical Assistance Program regulations. 42 C.F.R. § 455.106 (c)(1); *see Villa v. Kansas Health Policy Auth.,* 296 Kan. 315, 329, 291 P.3d 1056, 1068 (2013) (noting that this subchapter deals with disclosure of information on ownership and control).  Had the Cabinet intended to adopt the same broad definition for its SCL regulations, it would have done so.  That this non-controlling authority suggests that the 42 C.F.R. § 455.101 definition of "termination" applies to the Social Security Act has no bearing on how Kentucky's SCL regulations define it.

In fact, the bulletin is only offering guidance as to when States are required to terminate a provider because another State has terminated that provider.  Consider *that* definition of "termination" now: when "the provider has exhausted all applicable appeal rights."  In dealing with one State honoring another State's termination, of course the former must wait until the provider has exhausted all appeal rights with the latter – to rule otherwise would lead to preemptive terminations that are ultimately overturned in the originating State.  For example, if State A attempted a meritless termination of a provider that was ultimately overturned on appeal, it would make no sense that State B was required to terminate the provider before the matter was resolved in State A.  This is a matter of federal law and simply not the type of situation that Kentucky's SCL regulations address.

However, viewing the regulations "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous," we find that CTA's interpretation is erroneous. *See, e.g.*, *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir.2003).[13]   First, the Court believes that the phrase "terminations . . . that were held in abeyance pending the decision of the administrative appeal process" refers to a specific class of terminations – those that were explicitly held in abeyance – and not all terminations, as CTA suggests.   As detailed above, the only terminations that are explicitly held in abeyance during appeal are those involving nursing or intermediate care facilities, as those facilities are specifically entitled to pre-termination administrative hearings.   907 Ky. Admin. Regs. 1:671 Sections 6(1).   Again, CTA was not one of these facilities.

But even assuming that the phrase "terminations . . . or other actions that were held in abeyance" was ambiguous, CTA's interpretation is inconsistent with the exact provision in question.   The major premise of its interpretation is that the whole phrase "terminations,

---

[13] CTA witness and Cabinet employee Ann Hunsaker has opined as to the existence of the "stay" in the regulations at issue.   We give no weight to her interpretation.   First, we note that the Cabinet has specifically prevented her from providing any legal testimony in this matter.   Second, her opinion is in direct opposition to arguments she made in a separate state court proceeding involving the termination of an SCL provider:

> Judge Wingate: What type of remedy do they have from the termination, you know, where you are transitioning these patients?
> Ann Hunsaker: They can appeal the termination. . . . *We will continue to transition the patients*, because we want to make certain of their safety and, you know, I realize that [the provider] is saying there are no safety issues, but we beg to differ . . . [I]f the eventual final order from the Secretary, is the determination was incorrect . . . [t]hen we will renew their certification, let them have another provider agreement and they can sign up people. *You know, they are not guaranteed . . . business or a certain number of people in their [SCL] program. The law just doesn't do that*.

DN 82-9, at 19:09.   Moreover, Judge Wingate's order granting the requested injunction in that case found that "unless [the Cabinet] is restrained from terminating Plaintiff from the SCL program and from transferring Plaintiff's patients to other services providers prior to Plaintiff having exhausted its administrative appeal rights, Plaintiff will suffer immediate and irreparable harm."   DN 103-1, p. 5.   Thus, even assuming Hunsaker's testimony regarding the meaning of 907 Ky. Admin. Regs. 1:671 may be entitled to some sort of deference (which it assuredly not an "Agency position" where it refuses to let her provide legal testimony) we would reject her position as inconsistent and unpersuasive. *See Smith v. Aegon Companies Pension Plan*, 769 F.3d 922, 928 (6th Cir. 2014) (citing *United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)).

sanctions pursuant to 42 U.S.C. 1320a-7, or other actions that were held in abeyance" is meant to convey this peculiar notion that all terminations and sanctions pursuant to 42 U.S.C. 1320a-7 are, themselves, actions that are held in abeyance during appeal.  In other words, it claims that the terms "terminations" and "sanctions" are defined by the phrase "actions that were held in abeyance."  Yet, a quick reading of 42 U.S.C. § 1320a-7 reveals that the "sanctions" referred to can apply to entities before an administrative hearing, after an administrative hearing, or even in the absence of an administrative hearing. *See* (detailing the criminal convictions, exclusions under State health care programs, and other actions that result in sanctions).  Surely CTA does not suggest that this provision trumps federal law.  Resultantly, the logic on which CTA's interpretation rests – that all sanctions and terminations are held in abeyance – is flawed because 42 U.S.C. § 1320a-7 explicitly provides that many sanctions are, in fact, *not held in abeyance* during appeal.  And thus, the opposite must be true: Section 10(3)(a) only applies to those terminations, sanctions pursuant to 42 U.S.C. 1320a-7, or other actions that are specifically held in abeyance during appeal *by their originating source*.  For the sanctions listed, that source is unquestionably 42 U.S.C. 1320a-7; and for the terminations, the source is 907 Ky. Admin. Regs. 1:671 Section 6(1), the regulatory provision that says only nursing and intermediate care facilities are entitled to pre-termination hearings..

Recall that 907 Ky. Admin. Regs. 1:671 Section 6(1) – not coincidentally titled "Termination of Provider Participation" – lays out exactly which providers are entitled to a pre-termination hearing and which are entitled to a post-termination hearing.  This Section informs which "terminations . . . are held in abeyance during appeal," not Section 10(3)(a).  Still, CTA asserts that all providers a guaranteed pre-termination hearing once they have filed their appeal, an interpretation would render Section 6(1)'s distinction meaningless.  We decline to pick and

choose the regulations in that manner.  Moreover, the regulatory provision the Cabinet relied on provided for *immediate termination* of CTA. 907 Ky. Admin. Regs. 1:671 Sections 6(19).  The term "immediate" also loses all meaning if an SCL provider can automatically delay its termination by filing an appeal, as CTA suggests.  Our interpretation is more appropriate than CTA's in both senses because it harmonizes these sections of the SCL regulations instead of giving them competing meanings. *See DeStock No. 14, Inc. v. Logsdon*, 993 S.W.2d 952 (Ky.1999).  We must reject CTA's position for these reasons.

Accordingly, we find as a matter of law that 907 Ky. Admin. Regs. 1:671 does not provide SCL providers with a "stay" that prevents the Cabinet from terminating them and transferring their clients while appeals are resolved.  Nor is there anything in the regulations that even arguably requires the Cabinet to escrow a provider's Medicaid-reimbursements during an appeal of the termination in question.  We predict that Kentucky's highest-court would agree.  Thus, the Court finds that CTA's stay-and-escrow arguments are without merit.

Notwithstanding this finding, there remains one avenue through which CTA could have prevented the Cabinet from transferring its clients and terminating its SCL status on August 2, 2011: a court ordered injunction.  However, the record reveals that, while Lee claimed to have had one planned, CTA never even filed for an injunction.  DN 82-5, p. 171.  As a result, we need not occupy ourselves with retrospectively (and speculatively) predicting the merits of any such hearing because that opportunity ceased to exist when the termination became effective.  Having failed to come forth with evidence of a stay or injunction, CTA has not shown that it could have continued to provide SCL services or receive any reimbursements during its appeal.

In a word, CTA was left with an organization that, in light of the moratorium, termination, and resultant transfers, would have had no clients left to serve as of August 2.

46

CTA's only (and even more speculative)[14] chance of survival at this point would have been to: 1). retain its employees; 2). resolve the termination through successful appeal or re-application; and, 3). then reenroll clients.  CTA nonetheless *deprived itself* of this opportunity when Lee fired CTA's entire staff on August 2, retroactive to July 31, three days prior to the termination's effective date.  True, many of CTA's staff had already transferred to Homeplace in anticipation of the termination at this point, but the record reveals that at least some of its Behavior Analysts had not.  Regardless, Lee made no efforts to determine who remained with CTA or to salvage its business.  So even assuming CTA had put forth evidence showing that it could have paid its staff during the appeal, which it has inexplicably failed to do, we find that Lee's actions on August 2 put the metaphorical nail in CTA's coffin by leaving CTA – an organization whose client loss and SCL termination were guaranteed – without a staff.  If not the "corpse" of an organization, CTA was now certainly a shell of one.

Finally, had there been any hope that CTA could win its appeal and rebuild from scratch, it ultimately opted instead to settle around one year after the termination.  The settlement did not revoke CTA's termination as a SCL participant, however, but did change it to a "termination for convenience."  CTA has yet to reapply for Kentucky's SCL program.

After examining these four events in detail, the Court discerns a definite pattern: the Cabinet and CTA caused CTA's damages, and the Defendants reacted.  The moratorium and termination – legal actions that effectively stripped CTA of any clients to serve – were caused by the murder and investigation that followed and mandated by the Cabinet, not by anything the

---

[14] Assuming that CTA did request any continuations or acquiesce to any continuation requests by the Cabinet, the regulations would have entitled CTA to an administrative hearing within sixty (60) calendar days from August 1, the day it requested an administrative hearing.  907 Ky. Admin. Regs. 1:671 Section 9(7)(a).  It has put forth no evidence showing that it would have been financially possible for it to continue paying its staff, as it repeatedly claimed it would do, without Medicaid reimbursements during this period.  CTA's "plans" to pay its staff during the appeal appear to have been nothing more than an idea.  *See* DN 82-5, p. 180.

Defendants did or did not do.  Construing the evidence in a light most favorable to CTA, all reasonable inferences drawn therefrom still indicate that the murder, moratorium, and termination were the probable causes of CTA's damages and that the Defendants actions were, at best, possible causes.[15]  This is then bolstered by the fact that the two subsequent actions that ended CTA's Kentucky operations for good and "buried" its metaphorical coffin – the mass-firing and settlement – were actions that CTA took voluntarily.  The blame that CTA has asked us to point at the Defendants should be pointed at CTA itself.  And if we were to accept CTA's inventive legal positions as correct, its proof of damage causation would still be riddled with layers of speculation – that it could have paid its employees and served clients for free during its appeal and that it would have won the appeal.  As such, we are convinced that CTA's damages would have been the same absent the Defendants' conduct.  Because a rational jury could not conclude that the Defendants caused CTA's damages, the Defendants are entitled to summary judgment on all counts.

### L.  Counts XII and VIII: Request for Accounting/Constructive Trust and Declaratory Judgment and Relief

The Court addresses CTA's request for request for accounting and declaratory judgment together because they are *remedies* for the wrongdoings alleged above, not as actionable claims. *AmSouth Bank v. Dale*, 386 F.3d 763, 787 (6th Cir. 2004). Moreover, because they are both premised on resolution of an underlying claim in the Plaintiff's favor, the Court is in its right to deny this relief where all of the underlying claims have fallen. *See Indiana Ins. Co. v. SunTrust*

---

[15] We briefly address CTA's argument that Supreme Court of Connecticut's holding in *Larsen Chelsey Realty v. Larsen* is instructive on the causation issue before us. 656 A.2d 1009, 1014 (1995). Though the defendant's actions in that case were admittedly similar to those here, the circumstances surrounding the plaintiff's business in *Larsen* were markedly different than those facing CTA.  The plaintiff in *Larsen* was merely struggling financially and considering merging with a competitor; CTA was facing the immediate termination of its ability to serve clients that generated over 97% of its yearly revenue. DN 90-1.  The cases would be more similar if the plaintiff in *Larsen* was going out of business or was being "shut down" by a state actor, but that was not the case. *Id*. at 1014.  Moreover, the court in Larsen did not even address the causation question, so its value is questionable.

*Mortgage, Inc.*, 502 F. Supp. 2d 609, 610-13 (W.D. Ky. 2007); *see also James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 824 (E.D. Ky. 2013) (explaining that showing a contractual or fiduciary relationship is a prerequisite to an accounting). Because all of CTA's claims have failed, we will do so on this basis.

### IV.

For the reasons set forth herein, the Court will grant the Defendants motions for summary judgments as to all counts. DN 87-1; DN 91-1. A separate order and judgment will be entered this date in accordance with this Memorandum Opinion.

February 6, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**

49